# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs May 9, 2012

## RHONDA MEDLEY v. STATE OF TENNESSEE

**Appeal from the Bedford County Circuit Court**
**No. 11729      Robert Crigler, Judge**

**No. M2010-01181-CCA-R3-PC - Filed July 16, 2012**

Rhonda Medley ("the petitioner" or "the defendant") was convicted by a jury of five counts of rape of a child. Her convictions were affirmed on appeal. She filed the instant petition for post-conviction relief alleging ineffective assistance of counsel. The post-conviction court denied relief following an evidentiary hearing. On appeal, she asserts that her trial counsel performed ineffectively by failing to advise her properly regarding her right to testify at trial and by failing to call certain witnesses. After a careful review of the record, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and JOHN EVERETT WILLIAMS, JJ., joined.

Hershell D. Koger, Pulaski, Tennessee, for the appellant, Rhonda Medley.

Robert E. Cooper, Jr., Attorney General & Reporter; Meredith Devault, Senior Counsel; Charles Crawford, District Attorney General; Michael Randles, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

Background Facts & Procedural History

On March 3, 2008, a Bedford County jury convicted the petitioner on five counts of rape of a child, all Class A felonies. Following a sentencing hearing on May 30, 2008, the trial court imposed an effective forty-year sentence. The petitioner's attorney ("trial counsel") filed an untimely motion for new trial on July 18, 2008. After the trial court denied the motion, the petitioner did not appeal.

On September 24, 2008, the petitioner filed a *pro se* motion styled "Motion for Modification/Reduction of Sentence." The motion alleged, in part, that the petitioner received ineffective assistance of counsel at trial. The post-conviction court appointed counsel, who subsequently voluntarily withdrew the petition. Appointed counsel re-filed a petition for post-conviction relief on May 29, 2009, seeking relief on the basis of ineffective assistance of counsel. In addition, the petition sought a delayed direct appeal to this Court.

Following an evidentiary hearing on September 25, 2009, the post-conviction court denied the petitioner's claim of ineffective assistance of counsel. The post-conviction court, however, did grant the petitioner a delayed direct appeal. In a separate proceeding on delayed direct appeal, this Court affirmed all five convictions but vacated the sentences imposed in counts two through five. See State of Tennessee v. Rhonda Louise Medley, No. M2009-02446-CCA-R3-CD, 2011 WL 2739512 (Tenn. Crim. App. July 12, 2011), perm. app. denied (Tenn. Nov. 16, 2011). We remanded the case for resentencing on those counts in compliance with Tennessee Code Annotated section 39-13-522(b)(2)(A) (2006).

In the instant appeal from the denial of her claim of ineffective assistance of counsel, we granted the petitioner's request to stay the pending proceedings until the conclusion of her delayed direct appeal. This Court then lifted the stay after written notification by the petitioner that she did not intend to amend her post-conviction petition with any new grounds for relief arising out of the delayed appeal. Thus, we will now address the merits of the petitioner's appeal from the post-conviction court's denial of her claim of ineffective assistance of counsel.

*Evidence at Trial*

In our prior opinion on direct appeal, we summarized the proof adduced at the petitioner's trial as follows:

> The charges in this case arose from the twenty-eight-year-old female defendant's act of having sex with the twelve-year-old male victim on multiple occasions. Based upon these actions, the defendant was indicted by a Bedford County grand jury for five counts of rape of a child.

> At the subsequent jury trial, the victim testified as to his date of birth and stated that in July 2007, he was twelve years old. The victim explained that, during that month, he had sex with the defendant in her residence a total of five times. According to the victim, he met the defendant for the first time during the summer of 2007 through his friend, who was the defendant's nephew. The victim explained that there were typically five or six children

around the defendant's house and that he enjoyed visiting there and playing video games with the defendant's nephew.

The [victim] indicated that on July 4, he and the defendant began writing each other notes about having sex. He testified that, following a July 4th trip to Portland, he and the defendant had sex for the first time. He stated that he was at the defendant's residence and that she told him to come into her room, at which point she began to remove her clothing. After the victim removed his clothing, he and the defendant had sexual intercourse. The victim also recalled that on this occasion, the defendant told him that he did not need to wear a condom because she could not have babies and that he should not tell anyone about them having sex.

The victim then proceeded to describe a second instance of sexual intercourse with the defendant that occurred a few days later in the defendant's bedroom. The victim then testified to a third instance of sexual contact in the defendant's bedroom, occurring several days later. He stated that on this occasion, the defendant performed oral sex on him and that they then had intercourse. The victim also related details about the fourth and fifth sexual encounters in the defendant's bedroom during which he and the defendant had sexual intercourse. The [victim] specifically testified that each of these acts occurred during the month of July 2007. He further indicated that, on each occasion, his penis entered the defendant's vagina and that he ejaculated. The victim testified that the defendant would sometimes leave her t-shirt on during sex, but he stated that he had seen a tattoo of two dolphins on her back and a tattoo on her ankle. The victim also indicated that he believed that the defendant had her belly button pierced.

The victim testified that, following the last sexual encounter with the defendant, she informed him that they needed to stop having sex because she feared that her children would be taken from her. The defendant told the victim that she "would wait for [him] until he turned [eighteen]." The victim later told several of his friends about the sexual encounters with the defendant, and the defendant later received an anonymous letter in the mail regarding her relationship with the victim. Thereafter, the victim spoke with Officer Carol Jean and Detective Brian Crews concerning his activities with the defendant. He failed to tell the officers that the defendant had performed oral sex on him, but he explained that he did so because the defendant had told him not to tell anyone.

The next witness called by the State was Officer Carol Jean of the Shelbyville Police Department. Officer Jean testified that she received a phone call regarding an allegation of child sexual abuse involving the victim and the defendant and that she immediately called the Department of Children Services' (DCS) hotline to make a referral. The next morning, Officer Jean and a worker from DCS went to the victim's school. While the victim disclosed "a little detail" of the sexual contact with the defendant to Officer Jean, he indicated that he preferred to speak with a male officer, who was then called. Following the interview with the victim, Officer Jean went to the defendant's residence in Bedford County and requested that she come to the police department. During the subsequent interview, the defendant admitted that she had sexual intercourse with the twelve-year-old victim on several occasions and acknowledged that she had performed oral sex on him on at least one occasion.

Investigator Brian Crews of the Shelbyville Police Department, the male officer called by Officer Jean, testified that he reported to the victim's school in order to conduct an interview. During the interview, the victim told Investigator Crews the details of his sexual contact with the defendant. The victim told Investigator Crews about the tattoo on the defendant's back and that her belly button was pierced. Investigator Crews later recorded an interview with the defendant at the police department during which the twenty-eight-year-old defendant admitted that she had engaged in acts of sexual penetration with the twelve-year-old victim. The defendant told Investigator Crews that the sexual contact began sometime after July 4, 2007, and ended before the beginning of the school year on August 6.

Detective Rebecca Hord of the Bedford County Sheriff Department testified that on August 21, 2007, she received an anonymous letter in the mail containing allegations that the defendant was having sexual contact with a twelve-year-old boy. Detective Hord, who had known the defendant for a long time, testified that later that same day the defendant came to the sheriff's department and told her that someone in her neighborhood was making false allegations about her having sex with a twelve-year-old boy. Detective Hord recalled seeing the defendant a week later in court, and the defendant approached her and apologized for lying to her. At that time, the defendant admitted that she had sex with the victim "two or three times."

The defense called Derek Clanton, an employee at a tattoo and body piercing studio, as its first witness. He testified that the defendant came into

-4-

the studio to get her belly button pierced on August 17, 2007. Clanton explained that he saw no evidence of any previous belly button piercing. Clanton testified that the defendant, during this visit, told him that she had been accused of molesting a twelve-year-old boy.

The next witness called by the defense was Pamela Goetz, the defendant's sister. She testified and produced photographs of the defendant's tattoos, particularly the tattoo of the dolphins on her back and of the tattoo "right above her private area that says sexy with two Playboy bunnies, one on each side." She also described other tattoos that were on the defendant's ankles and shoulder. She stated that the defendant had these tattoos prior to February 1, 2007. The defense then called Connie Honea, the defendant's aunt, and Francis Medley, the defendant's mother-in-law, to verify the existence of the defendant's tattoos and that they had been there for approximately a year and a half. No further witnesses were called, and the case was submitted to the jury.

Id. at *1-3.

*Evidence at Post-Conviction Hearing*

At the post-conviction hearing, the petitioner testified that she hired trial counsel to defend her and that she met with him "numerous times" in preparation for trial. Trial counsel testified that he had been licensed to practice law for more than twenty-eight years. His practice was largely devoted to criminal defense work, and he had handled numerous cases involving defendants charged with sexually abusing a child.

Trial counsel stated that the defense's theory was that the petitioner did not commit the offenses and that the victim fabricated the allegations. Trial counsel had several discussions with the petitioner about the State's evidence and the strength of the State's case. In the defense's favor, the State had no physical evidence. However, through discovery, trial counsel was aware of the petitioner's confession to police, which had been videotaped and eventually was played for the jury. Trial counsel believed that "[i]t was going to be extremely difficult to explain away those statements, particularly if we could not get them suppressed." Approximately one week before trial, trial counsel became aware of the additional confessional statements made by the petitioner to Captain Hord.[1] In trial counsel's

---

[1] Detective Hord apparently was promoted to the rank of Captain between the time of trial and the post-conviction hearing.

view, these two confessions coupled with the victim's expected testimony yielded "an extremely strong case" for the State.

Trial counsel realized that even if the defense successfully discredited the victim, it still would have to explain the petitioner's confessions. Toward this end, trial counsel asked the petitioner's treating psychiatrist, Dr. Fider, to review the petitioner's videotaped statement. Trial counsel asked Dr. Fider whether he could offer an opinion as to the petitioner's mental or emotional state at the time that she gave the statement. Trial counsel hoped to use Dr. Fider's opinion to support a motion to suppress the statement. Dr. Fider, however, informed trial counsel that he would be unable to render a medical opinion in support of suppressing the statement. Trial counsel also independently reviewed the videotaped statement multiple times in order "to come up with some legitimate basis to support a motion to suppress" but was unable to do so.

Both the petitioner and trial counsel acknowledged that they discussed whether she would testify at trial. According to the petitioner, trial counsel told her that "it was my best interest if I didn't because [the prosecutor] would tear me apart and it would be worse on me if I got on the stand." She said that trial counsel did not elaborate on what he meant but that she based her decision not to testify on this advice. She also claimed that trial counsel did not discuss with her potential lines of inquiry in the event that she chose to testify. She recalled the trial court conducting a <u>Momon</u> hearing at her trial and recalled being told at the hearing that she had a right to testify and a right not to testify. The petitioner agreed that she told the trial court that she had made the decision not to testify. However, she said that she was "scared to death" at that point in the trial.

Had she testified, the petitioner would have told the jury that she did not commit the indicted offenses. She also would have explained that during her videotaped statement she "was scared to death," and she would have disputed making confessional statements to Captain Hord. Lastly, she would have told the jury about certain tattoos, scars, and marks on her body that could only be identified in the context of a sexual relationship. The petitioner elaborated that she has scars across the bottom of her abdomen, on her belly button, and at the top of her pubic area due to surgical incisions. She also revealed that she has a tattoo on her pubic area of two Playboy bunnies with the word "Sexy" tattooed in between. The petitioner also has a scar on her inner thigh as well as "severe stretch marks" on her abdomen and hips. The petitioner asserted that each of these identifying marks was present at the time of the offenses and that the victim did not describe them. She acknowledged on cross-examination that her family members testified to the presence of the Playboy bunnies and "Sexy" tattoo at trial.

Trial counsel said that the decision whether the petitioner would testify was not made until after the State had finished its proof. He said that the petitioner consulted with him and with other confidants in reaching her decision:

> [W]hat they all thought she should do and they were all in agreement that if she took the stand she was going to have to: A, refute the allegations and testimony of the boy; B, explain away the statements on the video; and then C, explain away or discredit Becky Hord.

When asked whether he told the petitioner that the prosecutor would "tear her up" if she chose to testify, trial counsel concurred that he used "[w]ords similar to that." He elaborated that he told the petitioner that the prosecutor was "very skilled" and that if she testified she would "have to have a consistent statement about her testimony that it didn't happen; the kid is lying." Trial counsel also told the petitioner that she would have to explain her videotaped statements as being coerced or the product of fear. Trial counsel cautioned the petitioner that "just simply saying so" would not be sufficient and that the prosecutor would not just "let it lay" and would explore her explanations "in great detail." Trial counsel also noted that, at the point in the trial when the petitioner chose not to testify, the defense had already put on witnesses, and the petitioner "already had some firsthand experience with [the prosecutor's] ability to cross-examine defense witnesses." Trial counsel acknowledged that the petitioner's testimony that she did not commit the crimes would not have been inconsistent with the defense's proof. Trial counsel also believed that such testimony by a defendant generally would have "a big impact" on a jury.

The petitioner also asserted at the post-conviction hearing that trial counsel should have called her husband, Patrick Medley ("Patrick"[2]), to testify at trial. The petitioner said that she discussed Patrick's potential testimony with trial counsel. She believed Patrick's testimony was important because he worked behind their residence and was home often during the month that the offenses occurred.

Patrick testified that at the time the allegations arose in July 2007, he was employed by the lawn care service for the housing authority where he and the petitioner lived. The housing authority's office was next door to their residence, and he took lunch and bathroom breaks at the residence. Patrick also said that he missed several days of work that month due to heat exhaustion. He explained that on the days that he missed work, he stayed home with the petitioner. He testified that he relayed this information to trial counsel and that he would

---

[2] Because the petitioner's husband and father-in-law share the same surname, we will sometimes refer to them by their given names only. We intend no disrespect.

have testified to same at trial. Patrick also testified that he never witnessed inappropriate behavior between the petitioner and the victim.

The petitioner also argued that trial counsel should have called her father-in-law, Lilburn Medley ("Lilburn"), to testify. She explained that Lilburn's testimony was important because "[h]e was in and out all of the time because he was on his way to work. He would stop by and check on us and check on the kids." She said that there was no certain time he would come by but that it could be "different times before he went to work."

Lilburn testified that he was at the courthouse during the petitioner's trial for "moral support" but did not believe that he was considered as a potential witness. He said that he never discussed with trial counsel whether he would testify. Lilburn said that he would have testified that he was often at the petitioner's house to visit his grandchildren. He sometimes was invited to visit and sometimes visited simply when he was in their neighborhood. He said that he might visit anytime during the day and would visit "pretty regular[ly]." He testified that he never witnessed sexual behavior between the petitioner and any of the children at her home. On cross-examination, Lilburn calculated that he would visit the petitioner's home "weekly, every other day. Just whenever I happened to be in the neighborhood or whatever."

Trial counsel acknowledged that he and the petitioner discussed whether to call Patrick and Lilburn as witnesses. On cross-examination, trial counsel admitted that their testimony would not have detracted from the defense's theory of the case. However, trial counsel did not believe that their testimony would have been significant, stating:

> I think my statement to them was proving that they come and go at different times on different days is not going to prove that this event could not have happened. It would only prove that it didn't happen when they walked in or if it did they didn't report it. That is the only thing it would prove.
>
> . . . .
>
> With the video statement; and Mrs. Hord's testimony; and the boy's testimony, pulling up a husband and a father-in-law to say it couldn't have happened because I dropped in from time to time and it would have been too big a risk for her to run, I don't think it would have had any impact at all.

Finally, the petitioner faulted trial counsel for failing to call Jamie Bloom, a physician's assistant who worked at her doctor's office. The petitioner explained that she had a complete hysterectomy in 2002 and possesses "no sexual drive whatsoever."

Subsequent to her hysterectomy, the petitioner asked Bloom whether "there was a form of female Viagra" to help increase her libido.

Bloom testified that he worked as a physician's assistant at Dr. Howard Rupert's practice and that the petitioner was one of Dr. Rupert's patients with whom Bloom interacted. He said that in 2004, the petitioner complained of common post-menopausal symptoms such as hot sweats, fatigue, mood fluctuations, and decreased libido. Bloom recalled being subpoenaed in March 2008, but he did not testify at trial. Bloom stated that his trial testimony would have been the same as he gave at the post-conviction hearing. On cross-examination, Bloom stated that the petitioner's claim of decreased libido was documented on her medical chart and would have been available at the time of trial.

Trial counsel acknowledged that the petitioner told him that she had a low sex drive and that she had requested hormones to increase her libido. Trial counsel said that prior to trial he contacted Dr. Rupert's office and was told that the petitioner was not on any hormonal treatment other than that normally prescribed to a woman following a hysterectomy. Trial counsel said that he did subpoena someone from Dr. Rupert's office; however, he decided that information about the petitioner's libido "was [not] going to be of any significance." Trial counsel noted that her request for hormone therapy had been three or four years prior to the offenses and did not result in any medical treatment. Trial counsel said that if the petitioner had insisted on calling Bloom as a witness then trial counsel would have done so. He acknowledged on cross-examination that Bloom's testimony would not have been inconsistent with the defense's theory of the case.

After hearing this evidence, the post-conviction court denied the petitioner's claim for ineffective assistance of counsel. In reaching its decision, the post-conviction court characterized the State's evidence at trial as being "great" and "real[ly] strong" based upon the petitioner's two separate confessions as well as the testimony of a credible victim.

The court accredited the testimony of Patrick and Lilburn Medley but ultimately found their testimony to be unavailing. The court noted that while both men testified that they were sometimes at the petitioner's residence, which would have made it more difficult for the petitioner and the victim to have had the opportunity to copulate, neither "could say exactly when they were in and out of the house." The court explained that "it is hard to alibi even a short period of time much less an entire month." Likewise, the court reasoned that Bloom's testimony that the petitioner complained of a decreased libido did not exclude the possibility that she would have sex. In this regard, the post-conviction court stated, "If somebody had a low sex drive it might be less likely they would engage in sex, but [it] doesn't necessarily follow. People with low sex drives can have sex also."

Finally, the post-conviction court found that the petitioner voluntarily decided during her Momon hearing not to testify. The court also noted that it did not fault trial counsel for advising the petitioner not to testify because such testimony "probably would have reiterated the [petitioner's] admissions to her detriment." The post-conviction court concluded that the petitioner had failed to prove either that trial counsel performed ineffectively or that she was prejudiced by any of trial counsel's alleged errors.

The petitioner appeals, asserting that the post-conviction court erred when it denied her claim of ineffective assistance of counsel. From her brief, we discern the following components to her claim of ineffective assistance of counsel:

(1) Trial counsel failed to sufficiently advise the petitioner with respect to whether she should testify at trial; and

(2) Trial counsel failed to call as witnesses at trial Patrick Medley, Lilburn Medley, and Jamie Bloom.

## Standard of Review

Relief pursuant to a post-conviction proceeding is available only where the petitioner demonstrates that his or her "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2006). To prevail on a post-conviction claim of a constitutional violation, the petitioner must prove his or her allegations of fact by "clear and convincing evidence." Tenn. Code Ann. § 40-30-110(f) (2006). See Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999). This Court will not overturn a post-conviction court's findings of fact unless the preponderance of the evidence is otherwise. Pylant v. State, 263 S.W.3d 854, 867 (Tenn. 2008); Sexton v. State, 151 S.W.3d 525, 531 (Tenn. Crim. App. 2004). We will defer to the post-conviction court's findings with respect to the witnesses' credibility, the weight and value of their testimony, and the resolution of factual issues presented by the evidence. Momon, 18 S.W.3d at 156. With respect to issues raising mixed questions of law and fact, however, including claims of ineffective assistance of counsel, our review is de novo with no presumption of correctness. See Pylant, 263 S.W.3d at 867-68; Sexton, 151 S.W.3d at 531.

## Ineffective Assistance of Counsel

The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a criminal defendant the right to representation by counsel

at trial.[3]  Both the United States Supreme Court and the Tennessee Supreme Court have recognized that this right is to "reasonably effective" assistance, which is assistance that falls "within the range of competence demanded of attorneys in criminal cases." Strickland v. Washington, 466 U.S. 668, 687 (1984); see also Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975).  The deprivation of effective assistance of counsel at trial presents a claim cognizable under Tennessee's Post-Conviction Procedure Act.  See Tenn. Code Ann. § 40-30-103; Pylant, 263 S.W.3d at 868.

In order to prevail on a claim of ineffective assistance of counsel, the petitioner must establish two prongs:  (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense.  See Strickland, 466 U.S. at 687; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996).  The petitioner's failure to establish either prong is fatal to his or her claim of ineffective assistance of counsel. Goad, 938 S.W.2d at 370.  Accordingly, if we determine that either prong is not satisfied, we need not consider the other prong.  Id.

To establish the first prong of deficient performance, the petitioner must demonstrate that his lawyer's "acts or omissions were so serious as to fall below an objective standard of 'reasonableness under prevailing professional norms.'" Vaughn v. State, 202 S.W.3d 106, 116 (Tenn. 2006) (quoting Strickland, 466 U.S. at 688)).  Our Supreme Court has explained that:

> [T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance.  It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence. Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations.

Baxter, 523 S.W.2d at 934-35 (quoting Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974)).  When a court reviews a lawyer's performance, it "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." Howell v. State, 185 S.W.3d 319, 326 (Tenn. 2006)  (citing Strickland, 466 U.S. at 689). Additionally, a reviewing court "must be highly deferential and 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional

---

[3] The Sixth Amendment right to counsel is applicable to the States through the Fourteenth Amendment to the United States Constitution.  See Gideon v. Wainwright, 372 U.S. 335, 342 (1963); State v. Howell, 868 S.W.2d 238, 251 (Tenn. 1993).

-11-

assistance.'" State v. Honeycutt, 54 S.W.3d 762, 767 (Tenn. 2001) (quoting Strickland, 466 U.S. at 689). We will not deem counsel to have been ineffective merely because a different strategy or procedure might have produced a more favorable result. Rhoden v. State, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991). We recognize, however, that "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992) (citing Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982)).

As to the prejudice prong, the petitioner must establish a "reasonable probability that but for counsel's errors the result of the proceeding would have been different." Vaughn, 202 S.W.3d at 116 (citing Strickland, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. "That is, the petitioner must establish that his counsel's deficient performance was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome." Pylant, 263 S.W.3d at 869 (citing State v. Burns, 6 S.W.3d 453, 463 (Tenn. 1999)). "A reasonable probability of being found guilty of a lesser charge . . . satisfies the second prong of Strickland." Id.

*The Petitioner's Testimony*

The petitioner first argues that she was denied the effective assistance of counsel due to trial counsel's failure to advise her sufficiently with respect to her decision whether to testify. She contends that her testimony was crucial because the defense's strategy hinged on denying the allegations and discrediting the victim. The State counters that the petitioner's decision not to testify was a tactical one intended to avoid potentially damaging cross-examination.

The petitioner stated that, had she testified, she would have told the jury that she did not commit the offenses, was "scared to death" when she confessed to police, and did not confess to Captain Hord. She also planned to tell the jury about various tattoos, scars, and stretch marks on her body that could only be identified when she was naked and which the victim did not detail at trial. The petitioner testified that trial counsel advised her against testifying because the prosecutor would "tear her up" on cross-examination. She said that trial counsel did not elaborate on what he meant. Trial counsel said that he relayed to the petitioner that if she chose to testify, she would have to consistently explain on the one hand that she did not commit the offenses, while on the other hand explain why she twice confessed. Trial counsel acknowledged that a claim of innocence by the petitioner was not inconsistent with the defense's theory and that generally such claims can "have a big impact" on a jury. However, trial counsel advised the petitioner that "just simply saying so" would be insufficient and that the prosecutor would explore her statements "in great detail."

The post-conviction court concluded that the petitioner freely and voluntarily waived her right to testify during a <u>Momon</u> hearing and that her decision was strategically intended to avoid cross-examination regarding her prior confessional statements. Upon review, we conclude that the record supports the post-conviction court's determination.

Both trial counsel and the petitioner agreed that the decision whether to testify was made by the petitioner on the advice of trial counsel. Moreover, both agreed that the decision was influenced by the desire to avoid rigorous cross-examination. Clearly, this decision was a tactical one that this Court will not second-guess with the benefit of hindsight. <u>See</u> <u>Rhoden</u>, 816 S.W.2d at 60. Consequently, we agree with the post-conviction court that the petitioner has failed to show that trial counsel performed deficiently.

Moreover, we have reviewed the transcript from the <u>Momon</u> hearing. It supports the post-conviction court's determination that the petitioner freely and voluntarily waived her right to testify. Thus, even were we to assume that trial counsel did not adequately convey to the petitioner the contours of her decision whether to testify, the petitioner adequately was apprised of her right to testify and the effects of her decision to waive that right during the <u>Momon</u> hearing. Consequently, we conclude that the petitioner also has failed to show prejudice, and she is not entitled to relief on this issue.

*Patrick and Lilburn Medley's Testimony*

The petitioner next asserts that she received ineffective assistance of counsel when trial counsel failed to call as witnesses her husband and father-in-law, Patrick Medley and Lilburn Medley, respectively. Both men would have testified that they were intermittently at the petitioner's residence during the month that the offenses occurred. The petitioner suggests that this testimony shows that it was not possible for her to have committed the offenses because of the threat of being caught in the act.

The post-conviction court accredited the testimony of Patrick and Lilburn; however, it ultimately concluded that their testimony would not have proven helpful to the petitioner. In this regard, the court reasoned that neither man could say precisely when they were at the residence, and both men's testimony merely indicated that they were occasionally around the residence at various times. As the post-conviction court noted, this testimony falls well short of providing an effective alibi and is ultimately of little significance in light of the overwhelming evidence of the petitioner's guilt. While their testimony may not have damaged the petitioner's case, it does not establish a reasonable probability that the result of the petitioner's case would have been different. Accordingly, we agree with the post-conviction court's conclusion that the petitioner is not entitled to relief on this issue.

*Jamie Bloom's Testimony*

Finally, we address the petitioner's contention that trial counsel performed ineffectively by failing to call Jamie Bloom as a witness at trial. Bloom would have testified that the petitioner complained to him in 2004 of a decreased libido following her hysterectomy. The petitioner asserts that such testimony would have bolstered her claim that she did not commit the offenses.

Trial counsel testified that he investigated the petitioner's claims with her doctor's office and was told that the petitioner had not been given hormonal treatment other than that normally prescribed for a woman following a hysterectomy. Trial counsel decided that evidence that the petitioner requested, but was not given, hormone therapy for a decreased libido several years before the offenses was of little significance.

The post-conviction court agreed and found that such testimony would have been unhelpful to the petitioner's cause. We likewise agree with the post-conviction court's assessment. The petitioner has not shown a reasonable probability that Bloom's testimony would have changed the result of the trial. Consequently, the petitioner is not entitled to relief on this issue.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the post-conviction court.

_____
JEFFREY S. BIVINS, JUDGE